Sean SILVEIRA; Jack Safford; Patrick Overstreet; David K. Mehl; Steven Focht, Sgt.; David Blalock, Sgt.; Marcus Davis; Vance Boyce; Keneth Dewald, Plaintiffs–Appellants,

v.

Bill LOCKYER, Attorney General, State of California; Gray Davis, Governor, State of California, Defendants–Appellees.

No. 01–15098.

United States Court of Appeals, Ninth Circuit.

Filed May 6, 2003.

Gary W. Gorski, Fair Oaks, CA, Daniel M. Karalash, Robert Lucas, Richards,

Karalash, Lucas & Lacy, Sacramento, CA, for Plaintiff–Appellant.

Nancy L. Palmieri, San Diego, CA, Tim L. Rieger, Office of the Attorney General, Sacramento, CA, David F. De Alba, Attorney General's Office of the State of California, Sacramento, CA, for Defendant–Appellee.

C.D. Michel, Trutanich & Michel LLP, San Pedro, CA, for Amicus.

Before: REINHARDT, MAGILL,* and FISHER, Circuit Judges.

Order; Dissent by Judge PREGERSON; Dissent by Judge KOZINSKI; Dissent by Judge KLEINFELD; Dissent by Judge GOULD.

## ORDER

A majority of the panel has voted to deny the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. FED. R. APP. P. 35.

The petition for rehearing en banc is denied.

PREGERSON, Circuit Judge, dissenting from the denial of rehearing en banc:

I agree with the panel's decision to uphold California's Assault Weapons Control Act. But I part from the panel's Second Amendment analysis. The right to keep and bear arms is in no way absolute; it is subject to reasonable restrictions such as those embedded in the statute the California legislature enacted. However, the panel misses the mark by interpreting the Second Amendment right to keep and bear arms as a collective right, rather than as an individual right. Because the panel's decision abrogates a constitutional right, this case should have been reheard en banc.

KOZINSKI, Circuit Judge, dissenting from denial of rehearing en banc:

Judges know very well how to read the Constitution broadly when they are sympathetic to the right being asserted. We have held, without much ado, that "speech, or ... the press" also means the Internet, see Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and that "persons, houses, papers, and effects" also means public telephone booths, see Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). When a particular right comports especially well with our notions of good social policy, we build magnificent legal edifices on elliptical constitutional phrases—or even the white spaces between lines of constitutional text. See, e.g., Compassion in Dying v. Washington, 79 F.3d 790 (9th Cir.1996) (en banc), rev'd sub nom. Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). But, as the panel amply demonstrates, when we're none too keen on a particular constitutional guarantee, we can be equally ingenious in burying language that is incontrovertibly there.

It is wrong to use some constitutional provisions as springboards for major social change while treating others like senile relatives to be cooped up in a nursing home until they quit annoying us. As guardians of the Constitution, we must be

* The Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

consistent in interpreting its provisions. If we adopt a jurisprudence sympathetic to individual rights, we must give broad compass to all constitutional provisions that protect individuals from tyranny. If we take a more statist approach, we must give all such provisions narrow scope. Expanding some to gargantuan proportions while discarding others like a crumpled gum wrapper is not faithfully applying the Constitution; it's using our power as federal judges to constitutionalize our personal preferences.

The able judges of the panel majority are usually very sympathetic to individual rights, but they have succumbed to the temptation to pick and choose. Had they brought the same generous approach to the Second Amendment that they routinely bring to the First, Fourth and selected portions of the Fifth, they would have had no trouble finding an individual right to bear arms. Indeed, to conclude otherwise, they had to ignore binding precedent. *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), did *not* hold that the defendants lacked standing to raise a Second Amendment defense, even though the government argued the collective rights theory in its brief. *See* Kleinfeld Dissent at 586–587; *see also* Brannon P. Denning & Glenn H. Reynolds, *Telling* Miller*'s Tale: A Reply to David Yassky*, 65 Law & Contemp. Probs. 113, 117–18 (2002). The Supreme Court reached the Second Amendment claim and rejected it *on the merits* after finding no evidence that Miller's weapon—a sawed-off shotgun—was reasonably susceptible to militia use. *See Miller*, 307 U.S. at 178, 59 S.Ct. 816. We are bound not only by the outcome of *Miller* but also by its rationale. If Miller's claim was dead on arrival because it was raised by a person rather than a state, why would the Court have bothered discussing whether a sawed-off shotgun was suitable for militia use? The panel majority not only ignores *Miller*'s test; it renders most of the opinion wholly superfluous. As an inferior court, we may not tell the Supreme Court it was out to lunch when it last visited a constitutional provision.

The majority falls prey to the delusion—popular in some circles—that ordinary people are too careless and stupid to own guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll. But the simple truth—born of experience—is that tyranny thrives best where government need not fear the wrath of an armed people. Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process. *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro–Americanist Reconsideration*, 80 Geo. L.J. 309, 338 (1991). In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence. *Id.* at 341–42. As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to resist. *See Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417, 15 L.Ed. 691 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms wherever they went"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble.

All too many of the other great tragedies of history—Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few—were perpetrated by armed troops against unarmed popula-

tions. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the Militia Act required here. *See* Kleinfeld Dissent at 578–579. If a few hundred Jewish fighters in the Warsaw Ghetto could hold off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.

My excellent colleagues have forgotten these bitter lessons of history. The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed—where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

Fortunately, the Framers were wise enough to entrench the right of the people to keep and bear arms within our constitutional structure. The purpose and importance of that right was still fresh in their minds, and they spelled it out clearly so it would not be forgotten. Despite the panel's mighty struggle to erase these words, they remain, and the people themselves can read what they say plainly enough:

A well regulated Militia, being necessary to the security of a free State, *the right of the people to keep and bear Arms, shall not be infringed.*

The sheer ponderousness of the panel's opinion—the mountain of verbiage it must deploy to explain away these fourteen short words of constitutional text—refutes its thesis far more convincingly than anything I might say. The panel's labored effort to smother the Second Amendment by sheer body weight has all the grace of a sumo wrestler trying to kill a rattlesnake by sitting on it—and is just as likely to succeed.

KLEINFELD, Circuit Judge, with whom Circuit Judges KOZINSKI, O'SCANNLAIN, and T.G. NELSON join, dissenting from denial of rehearing en banc:

I respectfully dissent from our order denying rehearing en banc. In so doing, I am expressing agreement with my colleague Judge Gould's special concurrence in *Nordyke v. King,*[1] and with the Fifth Circuit's opinion in *United States v. Emerson,*[2] both taking the position that the Second Amendment secures an individual, and not collective, right to keep and bear arms.

The panel opinion holds that the Second Amendment "imposes no limitation on California's [or any other state's] ability to enact legislation regulating or prohibiting the possession or use of firearms"[3] and "does not confer an individual right to own or possess arms."[4] The panel opinion erases the Second Amendment from our Constitution as effectively as it can, by holding that no individual even has standing to challenge any law restricting firearm possession or use. This means that an individual cannot even get a case into court to raise the question. The panel's theory is that "the Second Amendment

---

**1.** 319 F.3d 1185 (9th Cir.2003).

**2.** 270 F.3d 203 (5th Cir.2001).

**3.** *Silveira v. Lockyer,* 312 F.3d 1052, 1087 (9th Cir.2002).

**4.** *Id.* at 1056.

affords only a collective right,"[5] an odd deviation from the individualist philosophy of our Founders. The panel strikes a novel blow in favor of states' rights, opining that "the amendment was not adopted to afford rights to individuals with respect to private gun ownership or possession,"[6] but was instead "adopted to ensure that effective state militias would be maintained, thus preserving the people's right to bear arms."[7] It is not clear from the opinion whom the states would sue or what such a suit would claim were they to try to enforce this right. The panel's protection of what it calls the "people's right to bear arms" protects that"right" in the same fictional sense as the "people's" rights are protected in a "people's democratic republic."

Our circuit law regarding the Second Amendment squarely conflicts with that of the Fifth Circuit.[8] It is inconsistent with decisions of the Supreme Court that have construed the Second Amendment and phrases within it.[9] Our circuit has effectively repealed the Second Amendment without the democratic protection of the amendment process, which Article V requires.[10]

The panel decision purports to undertake historical analysis. Historical context has its uses in understanding the context and purposes of any law, constitutional or legislative,[11] but like legislative history, the use of history is subject to abuse. Where the historical scholarship is partial and tendentious, relying on it becomes like relying on legislative history: "entering a crowded cocktail party and looking over the heads of the guests for one's friends."[12]

Much of the panel decision purports to be an attempt to figure out what the word "militia" means in the Second Amendment. But the panel's failure to cite the contemporaneous implementing[13] statute defining the term demonstrates the tendentiousness of its analysis. The statute defining the militia, which in substance provides that the "militia" consists of all adult male citizens without regard to whether they are in any state or federal military service, has been subsequently altered to expand its coverage, but the federal militia statute remains in effect.[14] Besides overlooking the statute, the panel somehow failed to notice that the United States Supreme Court, in *United States v. Miller*,[15] held that the term "militia" in the Second

---

5. *Id.* at 1092.

6. *Id.* at 1087.

7. *Id.* at 1086.

8. *See United States v. Emerson*, 270 F.3d 203 (5th Cir.2001).

9. *See United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

10. U.S. Const. art. V (describing amendment procedure).

11. *See Portland 76/Auto Truck Plaza v. Union Oil*, 153 F.3d 938, 944 (9th Cir.1998) ("The statute and not the legislative history tells us

what solution Congress adopted for the problem, but the legislative history is useful to determine what the problem was.").

12. *Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring) (paraphrasing Judge Harold Leventhal).

13. Congress voted to send the Bill of Rights to the states in September 1789, and it was ratified by the states on December 15, 1791. The Militia Act was enacted in 1792.

14. *See* Militia Act, 1 Stat. 271 (1792); 10 U.S.C. § 311.

15. 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

Amendment meant, and means, "all males physically capable of acting in concert for the common defense." We are an inferior court, bound by this holding of the Supreme Court.

The panel opinion swims against a rising tide of legal scholarship to the contrary, relying heavily on a single law review article that claims "keep and bear" means the same thing as "bear," which itself means only to carry arms as part of a military unit.[16]

About twenty percent of the American population, those who live in the Ninth Circuit, have lost one of the ten amendments in the Bill of Rights. And, the methodology used to take away the right threatens the rest of the Constitution. The most extraordinary step taken by the panel opinion is to read the frequently used Constitutional phrase, "the people," as conferring rights only upon collectives, not individuals. There is no logical boundary to this misreading, so it threatens all the rights the Constitution guarantees to "the people," including those having nothing to do with guns. I cannot imagine the judges on the panel similarly repealing the Fourth Amendment's protection of the right of "the people" to be secure against unreasonable searches and seizures,[17] or the right of "the people" to freedom of assembly,[18] but times and personnel change, so that this right and all the other rights of "the people" are jeopardized by planting this weed in our Constitutional garden.

## I.

The Constitution with its amendments is the supreme law of this land, not historical artifact, so we must read it, determine what it means, and follow it, regardless of our policy preferences. The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[19] To figure out what the Second Amendment means, we should apply standard and commonly accepted rules of statutory and constitutional construction, such as the rule that all the words must ordinarily be given force. The forceful language in the operative language in the Amendment, "the right of the people to keep and bear Arms, shall not be infringed," is quite clear, as will be set out below. The statement of the purpose preceding these operative words, "A well regulated Militia, being necessary to the security of a free State," makes the conclusion unavoidable, once "militia" is read seriously, that the operative words guarantee an individual right.

The panel's strongest argument (but not strong enough) is that the word "bear" in the phrase "bear Arms" "customarily relates to a military function," so that when not acting in a military capacity, "the people" have no right to bear Arms.[20] The military meaning is certainly among the meanings of "bear," as is "large, heavily built, furry, four-legged mammal," and "investor pessimistic about the stock market." But the primary meaning of "bear" is "to carry,"[21] as when we arrive at our host's

16. *Silveira*, 312 F.3d at 1074 (citing Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 Chi.-Kent L. Rev 291, 294 (2000)).

17. U.S. Const. amend. IV.

18. U.S. Const. amend. I.

19. U.S. Const. amend. II.

20. *Silveira*, 312 F.3d at 1072–75.

21. *See* 2 *Oxford English Dictionary* 20 (J.A. Simpson & E.S.C. Weiner, eds.2d ed.1989).

home "bearing gifts" and arrive at the airport "bearing burdens." The only way to limit "bear" to its military meaning is to misread "militia" in the preamble as though it meant regulars in a standing military service, which, as shall be shown below, it emphatically does not.

Of course one can cherry-pick dictionary definitions, just as one can carefully select from legislative and other history. The panel opinion cites a law review article citing the *Oxford English Dictionary*, and asserts that the OED "defines 'to bear arms' as 'to serve as a soldier, do military service, fight.' "[22] This is correct as far as it goes,[23] but it is also misleading, because the OED says that the "main sense"[24] of "bear" is "to carry."[25] True, sense 6(a) of "bear" in the OED is "To carry about with one, or wear, ensigns of office, weapons of offence or defence,"[26] and the OED lists among the fourth sense of "arms," "to bear arms"—marked as figurative by the editors—defined as "to serve as a soldier, do military service, fight." Certainly the phrase has often been used this way, in judicial opinions and elsewhere. But that does not vitiate the "main sense" of "bear": to carry. The word was used the same way when Congress adopted the Second Amendment. Webster's 1828 Dictionary offers "To support" and "To carry" as the first and second meanings of "bear."[27] If

we used the panel's methodology, taking each word according a right in the Bill of Rights in the narrowest possible sense, then we would limit the freedom of "speech" protected by the First Amendment to oral declamations. The right of the people to "bear" arms means, taking the word in its ordinary sense both then and now, the right of the people to "carry" arms, subject as all constitutional rights are to reasonable regulation and restrictions.[28]

The word "keep" poses a much more difficult problem for those who, like the panel, favor judicial repeal of the Second Amendment. While "bear" often has a military meaning, "keep" does not. For centuries, the primary meaning of "keep" has been "to retain possession of."[29] There is only one straightforward interpretation of "keep" in the Second Amendment, and that is that "the people" have the right to retain possession of arms, subject to reasonable regulation and restrictions.

The panel claims that "[t]he reason why that term was included in the amendment is not clear."[30] Of course it is not clear to those who have chosen in advance to evade the ordinary meaning of the word. Professing mystification by the meaning of "keep," the panel does a very creative dance around the Founders' language, ar-

**22.** *Silveira*, 312 F.3d at 1073 (citing David Yassky, *The Second Amendment: Structure, History and Constitutional Change*, 99 Mich. L.Rev. 588, 619 (2000) (internal citation omitted)).

**23.** *Oxford English Dictionary* 634 (J.A. Simpson & E.S.C. Weiner, eds.2d ed.1989).

**24.** The Oxford English Dictionary divides meanings broadly into "senses." *See id.* at xxxviii-xxix.

**25.** 2 *Oxford English Dictionary* 20 (J.A. Simpson & E.S.C. Weiner, eds.2d ed.1989).

**26.** *Id.* at 21.

**27.** *Webster's 1828 Dictionary, available at* http://www.cbtministries.org/resources/ webster1828.htm (last visited April 21, 2003).

**28.** *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (permitting reasonable restrictions on exercise of right of free speech).

**29.** *See The American Heritage Dictionary* 698 (2d ed.1982).

**30.** *Silveira*, 312 F.3d at 1074.

guing that because "bear" means only to bear in military service, and "keep" is used in the same "unitary" phrase, "keep" must also be limited to military service.[31] Thus, "keep" means no more than "bear," that is to possess in the course of rendering service in a state militia. The dancers eventually trip up, though, because it is "a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."[32] The word "keep" must refer to something different from the word "bear." We, the people, are entitled by its separate meaning and the word "and" to have it construed as giving us a right separate from and additional to the right attached to the word "bear." Calling the phrase "unitary" is just a fancy way of depriving the word "keep" of any force. One might as well say that if someone has a right to keep and drive a car, and dies, his estate loses the right to keep the car because he can no longer drive it.

Colonial statutes, as well as those more recent, used "keep" and "bear" to mean two different things. These statutory usages show that before, during, and after Congress adopted the Second Amendment, "keep" and "bear" were not used in a "unitary" sense, nor was "keep" limited to militia service. For instance, seamen and others exempt from militia service were sometimes nevertheless required to "keep" arms.[33] Contemporary legal usage in statutes, as well as the plain meaning of the words, shows that law directed at the right or duty to "keep" arms was distinct from duties to "bear" arms in militia service.

## II.

The most important phrase for determining the scope of the operative words of the Second Amendment (and the most troublesome to the panel) is "the right of the people." The operative words of the amendment syntactically protect the right of "the people," not the "militia," to keep and bear arms. Despite the panel's extensive discussion of "keep," "bear," and the preamble, it simply skips over "the right of the people" and attempts no direct analysis of the phrase. *Marbury v. Madison* held that "It cannot be presumed that any clause in the Constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it."[34] Yet the panel's conclusion that the Second Amendment creates no individual rights whatsoever, only a "collective right" apparently not enforceable by anyone, requires that this clause establishing a "right of the people" be read as though it were "without effect."

The "collective rights" interpretation of the Second Amendment, that it confers a "right" only on state governments with respect to state militias, is a logical and verbal impossibility in light of the phrase "right of the people." As our Constitution is written, governments have "powers" but no "rights." People have both "rights" and "powers." And the Bill of Rights carefully distinguishes between the powers of the states and the rights of the people, never speaking of rights of the people when it means powers of the states.

The Tenth Amendment expressly draws both distinctions, between powers and rights, and between powers of state gov-

---

31.  *Id.* at 1074.

32.  *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations and quotations omitted).

33.  *See* Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L.Rev. 204 (1983).

34.  *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803).

ernments and powers of the people: "The *powers* not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or* to the people."[35] The Tenth Amendment reserves "powers," not "rights," to the state governments, and the Ninth preserves "rights" for "the people." By use of the word "or," the Tenth Amendment makes it crystal clear that "the people" are distinct from the state governments and hold some reserved powers that the state governments do not. The Ninth Amendment, speaking of "rights" rather than "powers," prohibits a construction that would deny unenumerated "rights" to "the people." Without it, the inference from an express listing of rights might have been that there are no others. The Ninth Amendment does not prohibit such an *expressio unius est exclusio alterius* inference with respect to the state governments, and the Tenth Amendment carefully avoids sorting out which powers are reserved to the states, and which to the people.

The Fifth Circuit conducts this same analysis in *United States v. Emerson.*[36] *Emerson* points out that the Constitution describes what governments exercise as "powers" or "authority."[37] The "legislative Powers" are vested in Congress and the "executive Power" is vested in the President. A "right," however, is *always* exercisable by an individual. Indeed, it

was not until recognition of the corporation as a legally cognizable "person" that the concept of an entity other than an individual having constitutional "rights" was even coherent, and the according of "rights" to "corporations" was and could be accomplished only by holding that they were "persons."[38]

The panel's holding that the right of "the people" with respect to weapons "was not adopted in order to afford rights to individuals"[39] but only so that "they would have the right to bear arms in the service of the state"[40] is logically absurd. This becomes clear if one interprets the phrase "the people" consistently, as sound construction always requires,[41] and applies the same construction to other amendments. The First Amendment preserves "the right of the people peaceably to assemble."[42] The panel's construction implies that no individual can sue in court for an abridgment of his or her right to assemble, because the right is reserved to the people acting collectively. The Fourth Amendment preserves "the right of the people" to security from unreasonable searches and seizures.[43] The panel's construction implies that no individual has a right enforceable in court to be free from unreasonable search and seizure, only "the people" as a collective. Because "the people" act collectively through their governments, the panel's logic suggests that the right to free

---

**35.** U.S. Const. amend. X (emphasis added).

**36.** 270 F.3d 203 (5th Cir.2001).

**37.** *Id.* at 228.

**38.** *See Pembina Consol. Silver Mining & Milling v. Pennsylvania,* 125 U.S. 181, 189, 8 S.Ct. 737, 31 L.Ed. 650 (1888).

**39.** *Silveira,* 312 F.3d at 1087.

**40.** *Id.* at 1076.

**41.** *See, e.g., Dept. of Revenue of Oregon v. ACF Indus.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (noting the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.") (quoting *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986)) (internal quotations omitted).

**42.** U.S. Const. amend. I.

**43.** U.S. Const. amend. IV.

assembly and the right to be free from unreasonable searches and seizures are protected only when people are acting, in the panel's phrase, "in the service of the state." That is not our country.

The panel's interpretation is inconsistent with the decision of the Supreme Court in *United States v. Verdugo–Urquidez.*[44] The Supreme Court said that the phrase "the people" "seems to be a term of art" used in the Preamble to the Constitution ("We the People"), Article I § 2 (members of the House are chosen by "the People"), and the First, Second, Fourth, Ninth and Tenth Amendments, with the same meaning in each place. The term "the people" means "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[45]

In the usage of the Bill of Rights, a right of "the people" is precisely what the panel says it is not: a right of individuals that, like their right to peaceably assemble and to be free from unreasonable search and seizure, the Constitution entitles them to assert against the government.[46]

There is also a collective aspect to "the people," but hardly the government—run collective contemplated by the panel. "We the People," when we "ordain and establish this Constitution,"[47] act through convention, and then ratification in each state through conventions of delegates chosen in each state by the people. The act of "the people" in this sense was revolutionary, replacing an old regime, the Articles of Confederation, with a new one. And a core value protected by the Second Amendment for "the people" was "the Right of the people to alter or abolish"[48] tyrannical government, as they had done a decade before. The concept had been established by law in England as well, after its revolution from 1640 to 1660. In 1765, Blackstone explained the right of every Englishman "of having arms for their defence" arose from "the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."[49]

As Blackstone describes the "natural right" of an Englishman to keep and bear arms, the arms are for personal defense as well as resistance to tyranny. The two are

---

**44.** *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

**45.** *Id.*

**46.** The Supreme Court has not determined whether the Second Amendment has been "incorporated" so as to apply against the states. Some commentators suggest that a battle over incorporation stands between the Amendment and any right enforceable against state legislation. *See, e.g.,* Gil Grantmore, *The Phages of American Law,* 36 U.C. Davis. L.Rev. 455, 474–75 (2003). The problem of exegesis posed by the First Amendment, "Congress shall make no law ...." is that somehow the prohibition against federal laws has to be extended to state laws. The Second Amendment says that "the right of the people

... shall not be infringed," without limiting this protection of "the people's" right to protection against the federal government, so there is no verbal barrier to incorporation as there was with the First Amendment. Since it is plain that the First and Fourth amendments, also protecting rights of "the people," are incorporated against the states, it is hard to discern any sound reason why the right of "the people" in the Second Amendment would not be similarly incorporated.

**47.** U.S. Const. pream.

**48.** The Declaration of Independence para. 2 (U.S.1776).

**49.** 1 William Blackstone, *Commentaries on the Laws of England* 139 (Legal Classics Library 1983) (1765).

not always separable. After the Civil War, southern states began passing "Black Codes," designed to limit the freedom of blacks as much as possible.[50] The "Black Codes" often contained restrictions on firearm ownership and possession.[51] The codes sometimes made it a crime for whites even to loan guns to blacks.[52] A substantial part of the debate in Congress on the Fourteenth Amendment was its necessity to enable blacks to protect themselves from White terrorism and tyranny in the South.[53] Private terrorist organizations, such as the Ku Klux Klan, were abetted by southern state governments' refusal to protect black citizens, and the violence of such groups could only be realistically resisted with private firearms. When the state itself abets organized terrorism, the right of the people to keep and bear arms against a tyrant becomes inseparable from the right to self-defense.

### III.

The Second Amendment begins with the clause "A well-regulated Militia, being necessary to the security of a free State...."[54] Like the words "keep," "bear," and "the people," this prefatory language requires a construction that accords it independent meaning. As we shall see, far from limiting the right of the people to keep and bear arms to their active military service in some state—run unit, the prefatory language compels an interpretation that protects the right of people as individuals to keep and bear arms.

Much of the panel opinion addresses the meaning of the term "militia," yet the panel fails to acknowledge the controlling authorities that establish the meaning. The word "militia" is a term of art, and does not mean in the Constitution and laws of the United States what it means in some popular and journalistic usage—a group of ultra-right wing individuals who arm themselves as a paramilitary force. The panel defines militia as "the permanent state militia, not some amorphous body of the people as a whole."[55] But the law establishes with the utmost clarity that the militia is precisely what the panel says it is not, an "amorphous body of the people as a whole."

The United States Supreme Court's decision in *United States v. Miller*[56] establishes the definition of "militia" in the Second Amendment, a definition we, as an inferior court, must apply. *Miller* holds that "[t]he signification attached to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military disci-

50. Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Toward an Afro Americanist Reconsideration,* 80 Geo. L.J. 309, 344 (1991).

51. *Id.* at 345.

52. *Id.* at 345 n. 178.

53. Stephen P. Halbrook, *That Every Man Be Armed* 110–15 (2d ed.1994). Chief Justice Taney, in contrast, had earlier led the Supreme Court to deny citizenship to blacks

precisely because it was so unthinkable they should have the full rights of citizenship—including the right "to keep and carry arms wherever they went." *Dred Scott v. Sandford,* 60 U.S. 393, 417, 19 How. 393, 15 L.Ed. 691 (1857).

54. U.S. Const. amend. II.

55. *Silveira,* 312 F.3d at 1072.

56. *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

pline.'"[57] As no intervening Supreme Court decision has altered this holding, we must proceed on the basis that a militia is a body of citizens, comprised at least of all males physically capable of acting in concert for the common defense. We shall see that "enrolled," for purposes of militia service, means something more like being registered for the draft, listed in the computer rolls for potential jury service, or enrolled by social security number for payment of taxes, than showing up at an armory for signup and training. The panel offers no explanation (and none could suffice) for failing to follow *Miller's* definition.

The Second Amendment was ratified in 1791. The next year, Congress enacted the Militia Act,[58] implementing the Amendment and incorporating the general understanding of the time as to what the word meant, and establishing that the militia was indeed what the panel says it was not—an "amorphous body of the people as a whole."[59] The Militia Act of 1792 defined the "militia" as: "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years."[60] Thus, contrary to the "collective rights" notion in the panel opinion, the militia was precisely *not* "a state entity, a state fighting force,"[61] limited to those who are active members of such a collective organization. It was *all* the able-bodied white male citizens from 18 to 45, whether they were organized into a state fighting force or not.

In the appendix, I have reproduced the full text of this act of the Second Congress of the United States, and the text of section one appears in the footnote. It is worth noting a few additional aspects of the act. First, "each and every" "free able-bodied white male citizen" between 18 and 45 is in the militia. Second, each such person "shall" be enrolled by the commanding officer and notified of his enrollment, whether he wants to be enrolled or not.[62] Most importantly, third, the act re-

57. *Id.* at 179, 59 S.Ct. 816.

58. Militia Act, 1 Stat. 271 (1792).

59. That contemporaneous Congressional enactments should inform our interpretation of the Bill of Rights is well established. *See Marsh v. Chambers*, 463 U.S. 783, 788–92, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (in discussing the constitutionality of opening legislative sessions with a prayer, "It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable.").

60. *Id.*

61. *Silveira*, 312 F.3d at 1070.

62. *CHAP. XXXIII.—An Act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States.*

*(a)*

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act. And it shall at all times hereafter be the duty of every such captain or commanding officer of a company to enroll every such citizen, as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years (except as before excepted) shall come to reside within his bounds; and

quired this "amorphous body of the people as a whole" to arm themselves, as opposed to the historical notion concocted by the panel that the Second Amendment merely "preserved the *right of the states* to arm their militias." [63] The key language of this enactment, contemporaneous with the Second Amendment, is that "every citizen so enrolled and notified shall, within six months thereafter, *provide himself* with a good musket or firelock ... or with a good rifle." [64] Each militiaman also, by federal law, had to "*provide himself*" with a bayonet, two spare flints, at least 24 cartridges if he brought a musket or firelock, or 20 balls (bullets) if he brought a rifle, and all sorts of other shooting equipment denoted in the finest detail by the statute.[65] The weapons, ammunition and accessories were, by federal statute, "exempted" from all suits and execution "for debt or for the

payment of taxes." [66] Thus militiamen were entitled to keep their weapons even if a creditor could take the rest of their property, and even if that creditor was the government (for unpaid taxes).

An incidental benefit from reading this contemporaneous implementing statute is that it makes perfectly obvious what "well regulated" meant at the time the Second Amendment was adopted. The panel seems to imagine that a well regulated militia is a people disarmed until the government puts guns in their hands after summoning them to service. But the contemporaneous statute shows that a well regulated militia is just the opposite, a people who have armed themselves at least to minimal national standards, and whom the militia officers inspect to assure that they have not wandered in off the streets without guns.[67] The "regulat[ion]" con-

shall without delay notify such citizen of the said enrolment, by a proper non-commissioned officer of the company, by whom such notice may be proved. That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned officers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound. And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required as aforesaid, shall hold the same exempted from all suits,

distresses, executions or sales, for debt or for the payment of taxes.

**63.** *Silveira*, 312 F.3d at 1087 (emphasis added).

**64.** 1 Stat. 271 (1792) (emphasis added).

A musket is a shoulder gun, not necessarily rifled, named as guns used to be after a small bird of prey. A firelock is a flintlock, igniting the powder by flint and steel much as a Zippo ignites lighter fluid; a rifle is a shoulder gun with grooves in the barrel to make the bullet spin like a foot-ball as it flies. *See* 5 *Oxford English Dictionary* 950 (J.A. Simpson & E.S.C. Weiner, eds.2d ed.1989) (firelock); 10 *Oxford English Dictionary* 132 (J.A. Simpson & E.S.C. Weiner, eds.2d ed.1989) (musket); and *see generally* John Olson, *The Book of the Rifle*, 7–9 (1974); *NRA Firearms Fact Book* 33–35 (3d ed.1989).

**65.** 1 Stat. 271 (1792) (emphasis added).

**66.** *Id.*

**67.** The notion of regulation requiring rather than prohibiting civilians to carry guns is not so antique as this reference may be taken to imply. The previously silent Alaska statutes

templated was not to disarm people when they were not at militia exercises, but rather to make sure they were armed, with their own guns. This was consistent with the colonial pattern of laws that typically "required colonists to carry weapons."[68] Among the acts of the crown seen as oppressions to be prevented from ever happening again were the Militia Acts of 1757 through 1763 authorizing British officials "to seize and remove the arms" of colonial militias when they thought it necessary to the peace of the kingdom.[69] The American Revolution was triggered when General Gage ordered troops to march from Boston to Lexington and Concord to do just that.[70] "[T]he Framers very arguably rejected as basic a Weberian notion as the state's monopoly on legitimate violence.... [T]he Framers weren't late-twentieth-century Americans (much less late-twentieth-century Europeans)...."[71] They were the heirs of two revolutions, the English and the American, with an altogether different worldview.

The federal militia act promulgated immediately after the Second Amendment was ratified assured that no state could lighten the burden of its militia—eligible citizens, perhaps by requiring of them only a dozen rounds of ammunition instead of two dozen. And the militia officers had to check to make sure all the able-bodied white male citizens showed up when summoned, as a jury clerk does. Beyond that, they had to conduct inspections to make sure everyone had the firearms, bullets, bayonets, two spare flints, quarter pound of powder, ammunition pouch, and all the accessories the statute required of them.[72] These were the national regulations of the "well regulated militia."

The interpretation the panel gives to the phrase "well regulated" makes no more sense than the interpretation it gives to "militia." The panel relies on a single law review article for the proposition that the purpose of a "well regulated Militia" is inconsistent with an individual right to own weapons.[73] The law review article simply presents the author's opinion, as an *ipse dixit*, that "[The Second Amendment] does not apply to the 'unorganized' militia, because that militia is certainly not 'well regulated' ... The majority in the First Congress intended to reassure the Antifederalists that the national government would not disarm those who are trained by the state militia and in that body—the 'well regulated Militia.'"[74] One reason this makes no sense is that the Second Congress, consisting of many of the same

---

were amended in 1949 to require flyers of small planes to carry emergency equipment including "one pistol, revolver, shotgun, or rifle, and ammunition for the same" much as the colonial statutes did, in order to enable the pilot to protect against bears if the plane went down before completing its flight. This requirement was deleted from the statute in 2001. *See* Alaska Stat. § 02.35.110 (current version); ACLA § 32–6–13 (1949), amended by § 2 ch 128 SLA 1949 (adding provision requiring firearms); and § 10 ch 56 SLA 2001 (deleting that provision).

**68.** *See* Joyce Lee Malcolm, *To Keep and Bear Arms* 139 (Harvard 1994).

**69.** *Id.* at 144.

**70.** *Id.* at 145.

**71.** Glenn Harlan Reynolds, The Second Amendment as a Window on the Framer's Worldview, in Eugene Volokh, Robert J. Cottrol, Sanford Levinson, L.A. Powe, Jr., & Glenn Harlan Reynolds, *The Second Amendment as Teaching Tool in Constitutional Law Classes*, 48 J. Legal Educ. 591, 598 (1998).

**72.** 1 Stat. 271 (1792).

**73.** *Silveira*, 312 F.3d at 1072 (citing Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 Chi.-Kent L.Rev. 195, 234 (2000)).

**74.** Finkelman, 76 Chi.-Kent L.Rev. at 234.

personnel as the first, described precisely what sort of regulation they had in mind for a "well regulated" militia, and far from requiring that anyone with a gun be trained and supervised, they required that all the untrained and unsupervised white male citizens between 18 and 45 acquire and maintain guns and ammunition. Another reason is that, as the panel concedes, the Second Amendment was written in part to avoid the necessity of standing armies, and protect the citizenry against standing armies, precisely the opposite of requiring that only members of formally organized standing collective government organizations have guns.

Were the modern federal statute to narrow the meaning of "militia" to something like the organized national guard that the panel envisions, then the statutory meaning of the term would differ from the meaning in the Second Amendment, and we would be bound, for Constitutional purposes, by the broader definition established by *Miller*. It would be as though Congress defined "press" for purposes of issuing press passes to a reserved section of the Capitol building to mean something narrower than "press" for purposes of the "freedom ... of the press" protected by the First Amendment. The new, narrower statutory meaning would not limit the Constitutional freedom.

We need not parse this problem, though, because Congress has broadened rather than narrowed the term. Today the United States Code still defines the term "mili-

tia."[75] The modern statute, instead of narrowing the militia to an organized body of regularly supervised and trained part time soldiers, *broadens* the term. The statute specifies that the "militia" consists not only of the "organized" militia, consisting of the National Guard and the Naval Militia, but also an "unorganized militia." The "unorganized militia" is precisely what the panel says it is not, "an amorphous body of the people as a whole." Now, instead of being limited to white male citizens between 18 and 45, the militia has (of course) no racial restriction. Non-citizens are now included, provided they have declared an intention to become citizens. The sex restriction is gone and females are included if they are members of the National Guard. People become part of the militia now at age 17 instead of 18. The only narrowing of the statutory scope is that we are no longer required by law to own and furnish guns, ammunition and bayonets. So now the militia consists not only of all white male citizens between 18 and 45, but also all able-bodied non-white males, whether citizens or non-citizens declared for citizenship, between 17 and 45, and all females in the National Guard. Those of us who are male and able-bodied have almost all been militiamen for most of our lives whether we know it or not, whether we were organized or not, whether our state governments supervised our possession and use of arms or not.

Thus, as used in law, the meaning of the word has not changed significantly, other

---

**75.** 10 U.S.C. § 311. Militia: composition and classes

    **(a)** The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

    **(b)** The classes of the militia are—
    **(1)** the organized militia, which consists of the National Guard and the Naval Militia; and
    **(2)** the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia

than to grow more inclusive. It is, and always has been, emphatically the case that militia members do not have to be "organized" in a "collective" state service, because the statute provides expressly for the existence of the "unorganized" militia. Members of the National Guard are in the "organized militia," and those not in the National Guard are also in the "unorganized militia." Various classes of persons are exempt from militia service, most notably the "organized fighting force," as the panel would put it, who are active "[m]embers of the armed forces." Thus, soldiers, as we now use the term, are generally *not* in the militia, and the rest of us *are.* Far from being an organized collectivity functioning as a fighting force, the militia is like the jury pool, consisting of "the people," limited, like the jury pool, to those capable of performing the service for which militias or jury pools are established. The militia is indeed "the people," as individuals and not as an organized collective body, and the Second Amendment expressly prohibits government from disarming the people.

## IV.

The next analytic task is to determine how the prefatory or purpose clause of the Second Amendment, "A well-regulated Militia, being necessary to the security of a free State," bears on the meaning of "the right of the people to keep and bear Arms." The panel's interpretation that the Second Amendment protects only the right of the states to arm their militias is syntactically impossible, because the language expressly provides that the right belongs to "the people" rather than the states or the militias. Treating the right the Sec-

ond Amendment assigns to "the people" as a power of the militia is even less defensible than it would be to limit the Congressional power to grant copyrights only to those writings that actually do "promote the Progress of Science and useful Arts," [76] rendering *The Wizard of Oz* and *Steamboat Willie* uncopyrightable. The task of providing a sounder interpretation is assisted by consideration of the historical context of the Second Amendment, the analytic approach used by the Supreme Court in *United States v. Miller,* and the practical consequences for militia service of an armed, or disarmed, populace.

The historical context of the Second Amendment is a long struggle by the English citizenry to enable common people to possess firearms. When the Amendment was adopted, the drafters doubtless turned to provisions in many of the state constitutions as models. [77] These provisions themselves had models, in the tradition of common-law lawyers copying older forms. Like many of our individual liberties, the right to keep and bear arms was cemented into English law in the aftermath of the English Revolution, a little over a century before the Second Amendment was drafted. And like many provisions of the federal Constitution, the Second Amendment had state constitutional models, among which justificatory preambles were common. [78]

The history that led to the drafting of the Second Amendment evolved for centuries in England, leading to its immediate predecessor in the English Declaration of Rights. A 1328 statute provided for forfeiture of arms and imprisonment if they

---

76. U.S. Const. art. I.

77. Eugene Volokh, *The Commonplace Second Amendment,* 73 N.Y.U. L.Rev. 793, 814 *et seq.* (1998).

78. *Id.* at 794 *et seq.*

were improperly used or carried.[79] A 1686 case construing that statute held that its purpose was "to punish people who go armed to terrify the King's subjects,"[80] apparently limiting the statute. Of course the King's subjects decided to quit being subjects in the English revolution, from 1640 to 1660, and seized for commoners rights that had previously been limited. After the Restoration, following a long series of grievances against James II, Parliament declared in 1689 that the English throne was "vacant."[81] In response to these grievances, and prior to offering the throne to William of Orange and Mary, parliament drafted the Declaration of Rights. In the debates leading up to the passage of the Declaration of Rights, members of parliament complained of Charles II's and James II's attempts to disarm their subjects.[82] Parliament conditioned William's and Mary's accession upon their acceptance of the Declaration of Rights (or Bill of Rights as it is usually termed) of 1689.

The English Bill of Rights, a century before ours, provided "That the subjects which are protestants, may have arms for their defence suitable to their conditions, and as allowed by law."[83] Since England had no states, obviously this right of "subjects" was a right of individuals, not of states. William Blackstone, who wrote his *Commentaries* roughly 75 years after the Declaration of Rights, provided the standard reference work for Colonial and early American lawyers. "[His] works constituted the preeminent authority on English law for the founding generation,"[84] and he was "the Framers' accepted authority on English law and the English Constitution."[85] Because Blackstone covered the whole of the common law in only four easily read, highly portable, well indexed volumes, it is easy to see why our Founders found his treatise so useful, and copied from it as much as they did. Blackstone explains that the right of "having" arms is among the five basic rights of every Englishman, those rights which serve to secure the "primary rights."[86] The right to have arms is a natural right, in Blackstone's view, because it arises from the natural right of self preservation, and the right (as an Englishman writing only a century after the English Revolution would be mindful of) of "resistance . . . to the violence of oppression." Blackstone wrote: "The fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law. Which is also declared by the same statute 1 W. & M. st. 2. c. 2 [the provision of the English Bill of Rights quoted above] and is

---

79. Statute of Northampton, 2 Edw. 3, c. 3 (1328) (quoted in 5 *The Founders' Constitution* 209 (Philip B. Kurland & Ralph Lerner, eds., Liberty Fund 1987)).

80. *Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B.1686) (quoted in 5 *The Founders' Constitution* 209 (Philip B. Kurland & Ralph Lerner, eds., Liberty Fund 1987)).

81. Joyce Lee Malcom, *To Keep and Bear Arms* 113 (Harvard 1994).

82. *Id.* at 115.

83. 1 W. & M., 2d sess., c, 2, Dec. 16, 1689 (quoted in 5 *The Founders' Constitution* 210 (Philip B. Kurland & Ralph Lerner, eds., Liberty Fund 1987)).

84. *Alden v. Maine*, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

85. *Neder v. United States*, 527 U.S. 1, 30, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (Scalia, Souter, & Ginsburg, JJ., concurring in part and dissenting in part).

86. 1 William Blackstone, *Commentaries on the Laws of England* 136, 139 (Legal Classics Library 1983) (1765).

indeed a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." [87] Though Blackstone refers to the right of resistance against oppression, his reasoning in the preceding pages is based more on the idea that life and limb are a gift of God, that natural liberty consists of "the right of personal security, the right of personal liberty, and the right of private property," [88] and that the high value of life is what pardons homicide if in self defense.[89]

The English Bill of Rights and the Constitution's predecessor state constitutions based on it protected a private and individual right to bear arms both for self defense and for defense against oppression, as Blackstone explained. The Second Amendment was not novel, but rather codified and expanded upon long established principles. These principles protected individual, not collective, rights to keep and bear arms. And it was so understood. William Rawle's *A View of the Constitution,* published in 1829, explained "The prohibition [in the Second Amendment] is general. No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both." [90] Likewise, Justice Jo-

seph Story wrote that "The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people. The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." [91]

Judge Thomas Cooley, in his *The General Principles of Constitutional Law* wrote "It may be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. The militia, as has been elsewhere explained, consists of those persons who, under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon. But the law may make provision for the enrolment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and if the right were limited to those enrolled, the purpose of this guaranty might be defeated alto-

---

87. *Id.* at 139.

88. *Id.* at 125.

89. *Id.* at 126.

90. William Rawle, *A View of the Constitution of the United States,* 125–26 (2d. ed 1829) (quoted in 5 *The Founders' Constitution* 214

(Philip B. Kurland & Ralph Lerner, eds., Liberty Fund 1987)).

91. 3 Joseph Story, *Commentaries on the Constitution* § 1890 (1833) (quoted in 5 *The Founders' Constitution* 214 (Philip B. Kurland & Ralph Lerner, eds., Liberty Fund 1987)).

gether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms, and they need no permission or regulation of law for the purpose." [92] Both Judge Cooley and Justice Story are, of course, expressly cited as "important" commentators by the Supreme Court's opinion in *Miller*.[93]

As Justice Thomas has written, "a growing body of scholarly commentary indicates that the 'right to keep and bear arms' is, as the Amendment's text suggests, a personal right." [94] The embarrassed attitude of many of the honest scholars who have so concluded, contrary to their own policy preferences, is well stated by the title of one of the seminal articles, "The Embarrassing Second Amendment." The texts and treatises appear generally to be moving to the view expressed in this opinion.[95]

### V.

What we have, in the Second Amendment, is a prohibition against government infringement of an individual right to keep and bear arms, consistent with what had long been understood to be a natural right guaranteed by the English Bill of Rights to Englishmen. The militia clause expanded the protection from the English Bill of Rights to emphasize the importance of a check and balance on standing armies in addition to the traditional English right to possess arms for purposes of self-defense. Like any right, it is not absolute. Just as the right to freedom of speech is subject to limitations for defamation, threats, conspiracy, and all sorts of other traditional qualifications, so is the right to keep and bear arms. Indeed, the word "infringed" in the Second Amendment suggests that the right, such as it is, may not be "encroached upon," [96] rather than that it, unlike all the other rights in the Bill of Rights, is absolute. The one thing that is absolute is that the Second Amendment guarantees a personal and individual right to keep and bear arms, and prohibits government from disarming the people.

The Supreme Court's decision in *United States v. Miller*[97] establishes the method by which we must apply the Amendment's

**92.** Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 281–82 (2d ed. 1891) (quoted in David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 B.Y.U. L.Rev. 1359, 1465 (1998)).

**93.** *United States v. Miller*, 307 U.S. 174, 182 n. 3, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

**94.** *Printz v. United States*, 521 U.S. 898, 938 n. 2, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Thomas, J., concurring) (citing J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo American Right 162 (1994); S. Halbrook, That Every Man Be Armed, The Evolution of a Constitutional Right (1984); Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L.J. 1236 (1994); Amar, The Bill of Rights and the Fourteenth Amendment, 101 Yale L.J. 1193 (1992); Cottrol & Diamond, The Second

Amendment: Toward an Afro Americanist Reconsideration, 80 Geo. L.J. 309 (1991); Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637 (1989); Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L.Rev. 204 (1983)).

**95.** *See, e.g.,* 1 Laurence H. Tribe, *American Constitutional Law* 902 n. 211 (3d. ed.2000) (recognizing a "right (admittedly of uncertain scope) on the part of individuals to possess and use firearms in the defense of themselves and their homes 8.") and Akhil Reed Amar, *The Bill of Rights* 46–63 (1998) (adopting individual rights view).

**96.** *The American Heritage Dictionary* 661 (2d ed.1982).

**97.** 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939).

opening clause, "A well regulated militia, being necessary to the security of a free state." In *Miller*, two defendants tried to get an indictment for possessing a sawed off shotgun dismissed on the basis of the Second Amendment right to keep and bear arms. The district court granted their motion. The Supreme Court reversed and remanded. *Miller* teaches that the Amendment has the "obvious purpose to assure the continuation and render possible the effectiveness"[98] of state militias who would be "civilians primarily, soldiers on occasion,"[99] because of the wariness at the time toward standing armies. The term "militia," *Miller* holds, was intended in the Second Amendment to denote substantially "all males physically capable of acting in concert for the common defense."[100] Far from being armed by the state governments as they found desirable, as the panel says,[101] *Miller* holds that "these men were expected to appear bearing arms supplied by themselves."[102] *Miller* cites Blackstone, Adam Smith, and colonial history sources, explaining the civilian aspect of militias, as opposed to standing armies, and that the militia system implied not just a right, but "the general obligation of all adult male inhabitants to possess arms,"[103] to assist as needed in defense, and to furnish ammunition, subject to fines if they did *not* possess arms.[104] Many of the colonies' laws, quoted extensively in *Miller*, established minimum standards to assure that the weapons were adequate, such as that a

musket had to be at least 3′9″ long. Much as building codes today require smoke detectors in the home, a man had to have a bullet mould, a pound of powder, four pounds of lead, and twenty bullets, to be produced when called for by a militia officer.[105]

Thus *Miller* cemented in, rather than reading out, the interpretation of the Second Amendment that I have followed. The Amendment reflected the Founders' hostility to standing armies, and had as its purpose assuring the effectiveness of a civilian non-standing militia consisting of most of the able-bodied male population, who were expected and often required to own their own guns. The reason that the defendants (who did not appear on appeal)[106] lost their case was that "*In the absence of any evidence* tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument.* Certainly it is *not within judicial notice* that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense."[107]

What is striking about the reversal in *Miller* is the great care the court took to limit its holding. *Miller* did not adopt the

---

**98.** *Id.* at 178, 59 S.Ct. 816.

**99.** *Id.* at 179, 59 S.Ct. 816.

**100.** *Id.*

**101.** *Silveira*, 312 F.3d at 1087.

**102.** 307 U.S. at 179, 59 S.Ct. 816.

**103.** *Id.* (quoting 1 Osgood, *The American Colonies in the 17th Century* ).

**104.** *Id.* at 180, 59 S.Ct. 816.

**105.** *Id.* at 180–81, 59 S.Ct. 816.

**106.** Stephen P. Halbrook, *That Every Man Be Armed* 165 (2d ed.1994).

**107.** *Miller*, 307 U.S. at 178, 59 S.Ct. 816 (emphasis added).

"collective rights" notion that only state governments as supervisors of the militia could possess arms, though the government had urged that interpretation on the Court in its brief.[108] *Miller* rejected the notion of a sawed-off shotgun as a militia weapon. It did not reject the right of individuals to possess arms. And *Miller* qualified even the rejection of sawed-off shotguns, by limiting the holding to a case where there was no evidence, and judicial notice could not be taken, of any "reasonable relationship" of sawed-off shotguns to militia use. Had the Court been of the view that the Second Amendment protected only the powers of the states to arm their militias, it would have accepted that argument from the government's brief, and never would have reached the issue of the relationship of sawed off shotguns to militias.

What private possession of arms does carry a "reasonable relationship to the preservation or efficiency of a well-regulated militia?" This is the question we must ask because this is the Second Amendment test *Miller* construes from the introductory clause of the Amendment. At the time the Amendment was drafted, when states were likely to have inadequate revenues to arm their militias, it was necessary that those who might be useful arm themselves with military type weapons. That is probably less relevant today, though times can always change. But the issue of furnishing arms for combat is not the only one involved in militia effectiveness. An effective militia requires not only that people have guns, but that they be able to shoot them with more danger to their adversaries than themselves. Standing next to a nineteen year old who for the first time has a loaded gun in his hands is like taking a fifteen or sixteen year old for his first driving lesson. And if no one knew how to shoot except designated shooters, a military supply unit of new recruits would be as helpless as if no one knew how to drive except designated drivers. Just as military mobility is enhanced by near—universal civilian knowledge of how to drive, likewise military effectiveness is promoted by widespread civilian shooting skills (and, we shall see, Congress has so decided and provided for civilian firearms training).

An effective militia undoubtedly requires that a considerable portion of the members enter it with some familiarity with gun safety and use. Beginning in 1916, Congress provided for the army to promote "practice in the use of rifled arms" by giving free weapons and ammunition to "youth-oriented organizations" and selling army surplus weapons to adults, in an army-assisted "Civilian Marksmanship Program."[109] In 1996, Congress created an independent federal corporation, the first board of directors to be appointed by the Secretary of the Army, to carry on the same program,[110] which is in effect today, for "instruction of citizens of the United States in marksmanship."[111] Congress directed that the corporation "give priority to activities that benefit firearms safety, training, and competition for youth and that reach as many youth participants as possible."[112] Thus, regardless of what policy preferences others might have, the policy Congress has adopted (and re-adopted in 1996) is to provide for a well regulated

**108.** *United States v. Emerson*, 270 F.3d 203, 223 (5th Cir.2001).

**109.** 10 U.S.C. § 4308 (1995).

**110.** 36 U.S.C. § 5501 (1996) (current version at 36 U.S.C. §§ 40701–02).

**111.** 36 U.S.C. § 5502 (1996), *recodified at* 36 U.S.C. § 40722.

**112.** 36 U.S.C. § 5502 (1996) *recodified at* 36 U.S.C. § 40724.

militia by putting guns in young people's hands and teaching them how to handle them safely and how to shoot them.

Though the stated justification and purpose of the Amendment relates to the militia, the language is carefully drafted to avoid abridging the traditional English Bill of Rights entitlement of individuals to possess arms for self defense. It would have, of course, been highly unlikely that the American Revolutionaries a few years later would have wanted to deprive Americans of rights they had always had as Englishmen. They protected this traditional right by attaching the "right ... to keep and bear Arms" to "the people," rather than establishing it as a "power" of the states. The English right was retained, and expanded.

Like most serious discussions of the Second Amendment, this dissent focuses heavily on history. Though general history, like legislative history, cannot be used to supplant the words of the law, it informs us of what social problem the writers of the law intended to address.[113] The problem the Founders sought to avoid was a disarmed populace. At the margins, the Second Amendment can be read various ways in various cases, but there is no way this Amendment, designed to assure an armed population, can be read to allow government to disarm the population.

## VI.

Constitutional interpretation cannot properly be based on whatever policy judgments we might make about the desirability of an armed populace, or the relevance of the Amendment's concern with citizen militias to modern times. Those who think the Second Amendment is a troublesome antique inappropriate to modern times can repeal it, as provided in Article V. That has been done before, as with legislative selection of Senators, and with Prohibition. There is a serious argument for its continued relevance, from those who think that the natural right to self defense, protected by the English Bill of Rights as well as the Second Amendment, is still important as a matter of policy. A police force in a free state cannot provide everyone with bodyguards. Indeed, while some think guns cause violent crime, others think that widespread possession of guns on balance reduces violent crime.[114] None of these policy arguments on either side affects what the Second Amendment says, that our Constitution protects "the right of the people to keep and bear Arms."

Neither can judges' policy concerns affect our duty as a court. Congress and the states may enact reasonable restrictions to manage the ways in which the populace exercises its right to keep and bear arms, just as reasonable restrictions are imposed on our rights to free speech, free assembly, freedom from search and seizure, and all our other constitutional rights. What the Second Amendment prohibits is not reasonable regulation consistent with its purposes, but disarmament of the people. Where the Constitution establishes a right of the people, no organ of the government, including the courts, can legitimately take that right away from the people. All of our rights, every one of them, may become impediments to the efficient functioning of our government and our society from time to time, but fortunately they are locked in by the Constitution against permanent loss because of temporary impediments. The courts should enforce our individual rights guar-

---

**113.** See *Portland 76/Auto Truck Plaza v. Union Oil,* 153 F.3d 938, 944 (9th Cir.1998).

**114.** *See, e.g.,* John Lott, *More Guns, Less Crime* (1998).

anteed by our Constitution, not erase them.

# APPENDIX

States, and for appropriating the same, took effect: *And provided also,* That such allowance shall not exceed the annual amount of seventy thousand dollars, until the same shall be further ascertained by law.

*not to exceed $70,000.*

Sec. 17. *And be it further enacted,* That the act, intituled "An act repealing after the last day of June next, the duties heretofore laid upon distilled spirits imported from abroad and laying others in their stead, and also upon spirits distilled within the United States, and for appropriating the same," shall extend to and be in full force for the collection of the several duties herein before mentioned and for the recovery and distribution of the penalties and forfeitures herein contained and generally for the execution of this act, as fully and effectually as if every regulation, restriction, penalty, provision, clause, matter, and thing therein contained were inserted in and re-enacted by this present act, subject only to the alterations hereby made.

*Certain act in force for collection of the duties, &c. herein.*

*1791, ch. 15.*

Approved, May 8, 1792.

*Statute I.*

Chap. XXXIII.—*An Act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States.*(a)

*May 8, 1792.*

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act. And it shall at all times hereafter be the duty of every such captain or commanding officer of a company to enrol every such citizen, as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrolment, by a proper non-commissioned officer of the company, by whom such notice may be proved. That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned officers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for

*Militia how and by whom to be enrolled.*

*How to be armed and accoutred.*

*1803, ch. 15.*

(a) The acts for the establishment of an uniform system for the government of the militia, are: An act more effectually to provide for the national defence by establishing an uniform militia throughout the United States, May 8, 1792, chap. 33; an act providing arms for the militia throughout the United States, July 6, 1798, chap. 65; an act in addition to an act entitled, "An act more effectually to provide for the national defence, by establishing an uniform militia throughout the United States," March 2, 1803, chap. 15; an act more effectually to provide for the organizing of the militia of the District of Columbia, March 3, 1803, chap. 20; an act establishing rules and articles for the government of the armies of the United States, April 10, 1806, chap. 20; an act in addition to the act entitled, "An act to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and to repeal the act now in force for those purposes," April 18, 1814, chap. 82; an act concerning field officers of the militia, April 20, 1816, chap. 64; an act to establish an uniform mode of discipline and field exercise for the militia of the United States, May 12, 1820, chap. 98; an act to reduce and fix the military peace establishment of the United States, March 2, 1821, chap. 12, sec. 14.

balls of the eighteenth part of a pound.  And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.

Executive officers, &c. exempted.

Sec. 2. *And be it further enacted,* That the Vice President of the United States; the officers judicial and executive of the government of the United States; the members of both Houses of Congress, and their respective officers; all custom-house officers with their clerks; all post-officers, and stage drivers, who are employed in the care and conveyance of the mail of the post-office of the United States; all ferrymen employed at any ferry on the post road; all inspectors of exports; all pilots; all mariners actually employed in the sea service of any citizen or merchant within the United States; and all persons who now are or may hereafter be exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, notwithstanding their being above the age of eighteen, and under the age of forty-five years.

1810, ch. 57, sec. 33.

Militia how to be arranged, and

Sec. 3. *And be it further enacted,* That within one year after the passing of this act, the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies, as the legislature of each state shall direct; and each division, brigade and regiment, shall be numbered at the formation thereof; and a record made of such numbers in the adjutant-general's office in the state; and when in the field, or in service in the state, each division, brigade and regiment shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank.  That if the same be convenient, each brigade shall consist of four regiments; each regiment of two battalions; each battalion of five companies; each company of

by whom officered.

sixty-four privates.  That the said militia shall be officered by the respective states, as follows:  To each division, one major-general and two aids-de-camp, with the rank of major; to each brigade, one brigadier-general, with one brigade inspector, to serve also as brigade-major, with the rank of a major; to each regiment, one lieutenant-colonel commandant; and to each battalion one major; to each company one captain, one lieutenant, one ensign, four sergeants, four corporals, one drummer and one fifer or bugler.  That there shall be a regimental staff, to con-

1803, ch. 15, sec. 3.

sist of one adjutant and one quartermaster, to rank as lieutenants; one paymaster; one surgeon, and one surgeon's mate; one sergeant-major; one drum-major, and one fife-major.

Each battalion to have one company of grenadiers, &c. and one company of artillery.

Sec. 4. *And be it further enacted,* That out of the militia enrolled, as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall be at least one company of artillery, and one troop of horse: there shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombadiers, one

Officers how to be armed.

drummer, and one fifer.  The officers to be armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges; and each private or matross shall furnish himself with all the equipments of a private in the infantry, until proper ordnance and field

Troops of horse how officered, &c.

artillery is provided.  There shall be to each troop of horse, one captain, two lieutenants, one cornet, four sergeants, four corporals, one saddler, one farrier, and one trumpeter.  The commissioned officers to furnish themselves with good horses of at least fourteen hands and an half high, and to be armed with a sword and pair of pistols, the holsters of which to be covered with bearskin caps.  Each dragoon to furnish himself with a serviceable horse, at least fourteen hands and an half high, a good saddle, bridle, mailpillion and valise, holsters, and a breast-plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch-box, to

Artillery and horse of whom to be formed;

contain twelve cartridges for pistols.  That each company of artillery and troop of horse shall be formed of volunteers from the brigade, at the

discretion of the commander-in-chief of the state, not exceeding one company of each to a regiment, nor more in number than one eleventh part of the infantry, and shall be uniformly clothed in regimentals, to be furnished at their own expense; the colour and fashion to be determined by the brigadier commanding the brigade to which they belong. *to be uniformly clad at their own expense.*

*1803, ch. 15:*

Sec. 5. *And be it further enacted,* That each battalion and regiment shall be provided with the state and regimental colours by the field officers, and each company with a drum and fife, or bugle-horn, by the commissioned officers of the company, in such manner as the legislature of the respective states shall direct. *What colors &c. and by whom to be furnished.*

Sec. 6. *And be it further enacted,* That there shall be an adjutant-general appointed in each state, whose duty it shall be to distribute all orders from the commander-in-chief of the state to the several corps; to attend all public reviews when the commander-in-chief of the state shall review the militia, or any part thereof; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act; to furnish blank forms of different returns that may be required, and to explain the principles on which they should be made; to receive from the several officers of the different corps throughout the state, returns of the militia under their command, reporting the actual situation of their arms, accoutrements, and ammunition, their delinquencies, and every other thing which relates to the general advancement of good order and discipline: all which the several officers of the divisions, brigades, regiments, and battalions, are hereby required to make in the usual manner, so that the said adjutant-general may be duly furnished therewith: from all which returns he shall make proper abstracts, and lay the same annually before the commander-in-chief of the state. *Adjutant-general in each state, his duty.*

*1803, ch. 15.*

Sec. 7. *And be it further enacted,* That the rules of discipline, approved and established by Congress in their resolution of the twenty-ninth of March, one thousand seven hundred and seventy-nine, shall be the rules of discipline to be observed by the militia throughout the United States, except such deviations from the said rules as may be rendered necessary by the requisitions of this act, or by some other unavoidable circumstances. It shall be the duty of the commanding officer at every muster, whether by battalion, regiment, or single company, to cause the militia to be exercised and trained agreeably to the said rules of discipline. *Rules of discipline.*

Sec. 8. *And be it further enacted,* That all commissioned officers shall take rank according to the date of their commissions; and when two of the same grade bear an equal date, then their rank to be determined by lot, to be drawn by them before the commanding officer of the brigade, regiment, battalion, company, or detachment. *Officers how to take rank.*

Sec. 9. *And be it further enacted,* That if any person, whether officer or soldier, belonging to the militia of any state, and called out into the service of the United States, be wounded or disabled while in actual service, he shall be taken care of and provided for at the public expense. *Provision in case of wounds, &c.*

Sec. 10. *And be it further enacted,* That it shall be the duty of the brigade-inspector to attend the regimental and battalion meetings of the militia composing their several brigades, during the time of their being under arms, to inspect their arms, ammunition, and accoutrements; superintend their exercise and manœuvres, and introduce the system of military discipline before described throughout the brigade, agreeable to law, and such orders as they shall from time to time receive from the commander-in-chief of the state; to make returns to the adjutant-general of the state, at least once in every year, of the militia of the brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements, and ammunition of the several corps, and every other thing which, in his judgment, may relate to their government and the *Brigade inspector's duty.*

*1803, ch. 15.*

Vol. I.—35

general advancement of good order and military discipline; and the adjutant-general shall make a return of all the militia of the state to the commander-in-chief of the said state, and a duplicate of the same to the President of the United States.

*Artillery &c. now existing,*   And whereas sundry corps of artillery, cavalry, and infantry now exist in several of the said states, which by the laws, customs, or usages thereof have not been incorporated with, or subject to the general regulations of the militia:

*to retain their privileges.*   Sec. 11. *Be it further enacted,* That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this act, in like manner with the other militia.

Approved, May 8, 1792.

---

Statute I.

May 8, 1792.   Chap. XXXIV.—*An Act relative to the compensations to certain officers employed in the collection of the duties of impost and tonnage.*

[Obsolete.]
Additional specific allowance from 1st of July next to certain surveyors and collectors.
1790, ch. 35.
sec. 53.
Act of March 2, 1799, ch. 23.

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the last day of June next, in addition to the fees and emoluments which may accrue to the officers employed in the collection of the duties of impost and tonnage, by the provisions already made, they shall severally have and be entitled to the respective allowances following, to wit: The surveyors of Newburyport, Salem, St. Mary's and Wilmington, in North Carolina, the yearly sum of one hundred dollars each; the surveyors of Beverly, North Kingston, East Greenwich, Warren, Bristol, Pawcatuck river, Providence, Patuxet, New Haven, Lewellensburg, Alexandria, Beaufort, Hertford, Winton, Bennet's creek, Plymouth, Windsor, Skewarkey, Murfreesborough, Nixonton, Indiantown, Currituck inlet, Pasquotank river bridge, and Newbiggen creek, the yearly sum of eighty dollars each; the surveyor of Portsmouth, the yearly sum of sixty dollars; the surveyors of Ipswich, Portland, Newport, Stonington, Middleton, Bermuda hundred, Petersburg, Richmond, and Savannah, the yearly sum of fifty dollars each; the surveyors of Gloucester, New London, and Swansborough, the yearly sum of thirty dollars each; the surveyors of Hudson, Little Egg Harbour, Suffolk, Smithfield, Urbanna, and Fredericksburg, the yearly sum of twenty dollars each; the collector of the district of Wilmington, in North Carolina, the yearly sum of one hundred and fifty dollars; the collectors of the districts of Portsmouth, Gloucester, Albany, Annapolis, Vienna, Nottingham, Yorktown, Dumfries, and Louisville, the yearly sum of one hundred dollars each; the collector of the district of Fairfield, the yearly sum of eighty dollars; the collectors of the districts of Marblehead, Plymouth, Barnstable, Nantucket, New Bedford, Dighton, York, Biddeford, and Pepperelborough, Bath, Wiscasset, Machias, Newport, New Haven, Perth Amboy, Great Egg Harbour, Wilmington, in Delaware, Chester, Cedar Point, Georgetown, Hampton, South Quay, Washington, Plank Bridge, and Georgetown, in South Carolina, the yearly sum of fifty dollars each; the naval officer of the district of Portsmouth, the yearly sum of one hundred dollars; the naval officers of the districts of Newburyport, Newport, Providence, Wilmington, in North Carolina, and Savannah, the yearly sum of fifty dollars each; the collector of the district of Salem and Beverly, one fourth of one per centum on the amount of all monies by him received on account of the said duties; and to the collectors of the districts of Portsmouth, Newburyport, Gloucester, Marblehead, Plymouth, Nantucket, Edgartown, New Bedford, Dighton, York, Biddeford, and Pepperelborough, Portland, Bath, Wiscasset, Penobscot, Frenchman's bay, Machias, Newport, Providence, New Haven, Fairfield, Perth Amboy, Burlington, Great Egg Harbour, Wilmington, in Delaware, Oxford, Vienna, Snowhill, Annapo-

---

GOULD, Circuit Judge, with whom Circuit Judge KOZINSKI joins, dissenting from denial of rehearing en banc:

The error of *Hickman v. Block*, 81 F.3d 98 (9th Cir.1996), is repeated once again, thus I respectfully dissent from denial of rehearing en banc for the reasons stated in my concurring opinion in *Nordyke v. King*, 319 F.3d 1185, 1192–98 (9th Cir.2003) (Gould, J., specially concurring). As I there explained, restricting the Second Amendment to a "collective rights" view and ignoring the individual right of the people to keep and bear arms is inconsistent with the Second Amendment's language, structure, and purposes, and weakens our Nation against recurrent internal and external threats that may undermine individual liberty. *See also United States v. Emerson,* 270 F.3d 203 (5th Cir.2001).