364 F.3d 1025
 Russell Allen NORDYKE; Ann Sallie Nordyke, dba TS Trade Shows; Jess B. Guy; Duane Darr; William J. Jones; Daryl David; Tasiana Wertyschyn; Jean Lee; Todd Baltes; Dennis Blair; R.A. Adams; Roger Baker; Mike Fournier; Virgil McVicker, Plaintiffs-Appellants,
v.
Mary V. KING; Gail Steele; Wilma Chan; Keith Carson; Scott Haggerty, County of Alameda; The County of Alameda Board of Supervisors, Defendants-Appellees.
 No. 99-17551.
 United States Court of Appeals, Ninth Circuit.
 Filed April 5, 2004.
 
 Before: ALARCÓN, O'SCANNLAIN, and GOULD, Circuit Judges.
 ORDER
 The panel voted to deny the petition for rehearing. Judges O'Scannlain and Gould voted to grant the petition for rehearing en banc, and Judge Alarcón so recommended. The panel requested a vote of the full court on whether the case should be reconsidered en banc. A majority of the active nonrecused judges of the court failed to vote in favor of rehearing en banc, and the petition is therefore denied. With this order the clerk shall also file Judge Kozinski's concurrence, Judge Kleinfeld's dissent from denial, and Judge Gould's dissent from denial.
 The stay of the issuance of the mandate is vacated.
 
 KOZINSKI, Circuit Judge, concurring:
 
 1
 The concerns raised by Judge Gould's dissent also triggered an en banc call in Silveira v. Lockyer, 312 F.3d 1052 (9th Cir.2002). After a vigorous exchange of views, the call misfired, 328 F.3d 567 (9th Cir.2003), and the Supreme Court shot down the petition for certiorari less than six months ago, 540 U.S. 1046, 124 S.Ct. 803, 157 L.Ed.2d 693 (2003). Because I believe prudential considerations militate against revisiting the issue quite so soon, I voted against taking this case en banc and so, regretfully, cannot join Judge Gould's bulls-eye dissent.
 
 
 2
 KLEINFELD, Circuit Judge, dissenting from denial of rehearing en banc:
 
 
 3
 I respectfully dissent. I join fully in Judge Gould's superb dissent, which explains coherently and most admirably why the Second Amendment guarantees an individual right to keep and bear arms.
 
 
 4
 Our court has erased 10% of the Bill of Rights for 20% of the American people. No liberties are safe if courts can so easily erase them, and no lover of liberty can be confident that an important right will never become so disfavored in popular or elite opinion as to be vulnerable to being discarded like the Second Amendment.
 
 
 5
 I have spelled out in great detail why our court's view of the Second Amendment is indefensible, in my dissent from denial of rehearing en banc in Silveira v. Lockyer.[1] Judge Gould has graciously noted some of the points in that dissent, and I will not restate them here.
 
 
 6
 Our court and the Fifth Circuit take opposite views. In United States v. Emerson, the Fifth Circuit reads the Second Amendment to establish an individual right to keep and bear arms.[2] Our court reads it not to. Our court takes what to me is a position verging on droll legal humor, that the right is a "collective" right belonging to state government, meaning that it is enforceable only by the state, even when the state is the violator.
 
 
 7
 Whether the Second Amendment guarantees an individual right is more likely to affect the outcome in this case than in Silveira. In Silveira, the challenge was to California's ban on assault weapons. Reasonable regulation of the individual right guaranteed by the Second Amendment might well have led to the same result, no relief, as the result reached by the panel using the "no individual right" argument. In this case, by contrast, the result might well have been different if we had not erased the Second Amendment. The ordinance at issue, subject to narrow exceptions, criminalizes any and all possession of firearms on county property. The case before the panel was about apparently law-abiding persons wanting to hold a gun show at a fairgrounds.
 
 
 8
 Some people think that the Second Amendment is an out-dated relic of an earlier time. Doubtless some also think that constitutional protections of other rights are outdated relics of earlier times. We The People own those rights regardless, unless and until We The People repeal them. For those who believe it to be outdated, the Second Amendment provides a good test of whether their allegiance is really to the Constitution of the United States, or only to their preferences in public policies and audiences. The Constitution is law, not vague aspirations, and we are obligated to protect, defend, and apply it. If the Second Amendment were truly an outdated relic, the Constitution provides a method for repeal. The Constitution does not furnish the federal courts with an eraser.
 
 
 
 Notes:
 
 
 [1]
 Silveira v. Lockyer, 328 F.3d 567, 570 (9th Cir.2003) (Kleinfeld, J., dissenting from denial of rehearing en banc).
 
 
 [2]
 United States v. Emerson, 270 F.3d 203 (5th Cir.2001).
 
 
 
 9
 GOULD, Circuit Judge, with whom O'SCANNLAIN, KLEINFELD, TALLMAN, and BEA, Circuit Judges, join, dissenting from denial of rehearing en banc:
 
 
 10
 I respectfully dissent from our denial of rehearing en banc. This case presents an important issue of the scope of the constitutional guarantee of the Second Amendment, arising in the context of state restriction of gun shows. The panel decision in this case, Nordyke v. King, 319 F.3d 1185, 1198 (9th Cir.2003), was compelled by our circuit's prior holding in Hickman v. Block, 81 F.3d 98 (9th Cir.1996), in which we embraced a "collective rights" reading of the Second Amendment. I believe Hickman was wrongly decided.[1] An "individual rights" interpretation, as was recently adopted by the Fifth Circuit in United States v. Emerson, 270 F.3d 203 (5th Cir.2001), consistent with United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939),[2] is most consistent with the text, structure, purposes, and history of the Second Amendment, as well as colonial experience and pre-adoption history. It also reflects what I consider to be the scholarly consensus that has recently developed on the question of how to best interpret the Second Amendment. We should recognize that individual citizens have a constitutional right to keep and bear arms, subject — in the same manner as all other core constitutional rights — to certain limits.[3] Thereafter, the chips will fall where they may, and decisions in due course will clarify what is and is not constitutionally permissible regulation, and the further standards for addressing it.
 
 
 11
 I dissent with recognition that we only recently denied en banc review in a case presenting a similar issue on the scope of the Second Amendment right to keep and bear arms. Silveira v. Lockyer, 312 F.3d 1052 (9th Cir.2002), reh'g en banc denied, 328 F.3d 567 (9th Cir.2003), cert. denied, 540 U.S. 1046, 124 S.Ct. 803, 157 L.Ed.2d 693 (2003). However, Nordyke differs from Silveira, and is more appropriate for en banc reconsideration of the holding in Hickman. In contrast to Silveira, which involved a challenge to a California law restricting the possession, use, and transfer of assault weapons, 312 F.3d at 1056, a provocative issue, appellants in Nordyke challenged a local ordinance prohibiting the possession of all firearms on county property, which had the effect of foreclosing a traditional gun show. Some may consider that the regulation of assault weapons may implicate too many difficult considerations beyond that of whether the Second Amendment confers an individual or collective right. The ordinance at issue in Nordyke, if it must be tested in light of an individual Second Amendment right, will not raise the same concerns. If the Second Amendment confers an individual right, then the Nordyke gun possession ban presents a better context in which our court might have assessed the constitutionally permissible bounds of gun regulation.
 
 
 12
 * The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This statement contains a substantive guarantee and a prefatory clause. The collective rights view of the Second Amendment places undue weight on a confused interpretation of the prefatory clause to reach the conclusion that the Second Amendment grants only a collective right. As I read it, the substantive guarantee of the Second Amendment grants a clear "right" to "the people" to "keep and bear Arms." The prefatory clause states that the purpose of this grant is to ensure a "well regulated Militia," which is "necessary to the security of a free State." As I explain below, the Second Amendment's prefatory clause does not, as advocates of the collective rights view argue, limit the substantive guarantee to persons enrolled in an organized state militia. And even if it were assumed that the Second Amendment's prefatory clause did limit the scope of the substantive guarantee to those in the "militia," the militia should be defined to encompass the people as a whole. The plain meaning of the language of the Second Amendment mandates an individual rights interpretation.
 
 
 13
 * The substantive guarantee of the Second Amendment can be broken down into two clauses, recognizing "the right of the people," "to keep and bear arms." Each of these phrases furthers the individual rights interpretation.
 
 
 14
 As with all of the first eight amendments of the Bill of Rights, the Second Amendment makes clear that its purpose is to grant a right to the people. As used throughout the text of the Constitution, "rights" and "powers" are granted to the people,[4] whereas government only has "power" or "authority."[5]
 
 
 15
 The Second Amendment states that the right it provides for is one "of the people." Apart from the Second Amendment, the phrase "the people" appears in four other places in the Bill of Rights.[6] There is no question that "the people," as used in the First, Fourth, Ninth, and Tenth Amendments refers to individuals; it is individuals who are granted the First Amendment right to assemble, are protected by the Fourth Amendment against unreasonable search and seizure, and under the Ninth Amendment retain rights not otherwise enumerated in the Constitution. And the Tenth Amendment makes a clear distinction between "the states" and "the people." Against this backdrop, it is hard to imagine that the drafters of the Constitution meant "the people" in the Second Amendment to take on a meaning different from the meaning ascribed to that term throughout the rest of the Bill of Rights.
 
 
 16
 A clear statement of the United States Supreme Court also guides our interpretation of the phrase "the people." In United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Court pronounced that "`[t]he people' seems to have been a term of art employed in select parts of the Constitution." Id. at 265, 110 S.Ct. 1056. Looking at the term as used in the Bill of Rights, the Supreme Court observed:
 
 
 17
 While ... textual exegesis is by no means conclusive, it suggests that `the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.
 
 
 18
 Id. In other words, in the view of the Supreme Court, the term "the people" means the same thing in each of these five Amendments: the individual members of the "national community." A right granted by the Constitution to "the people" is an individual right, not a right that is collective or quasi-collective.
 
 
 19
 The right granted to the people by the Second Amendment is one to "keep and bear arms." Those who support the collective rights view maintain that "keep and bear" should be read as a unitary phrase, see Silveira, 312 F.3d at 1074; Michael C. Dorf, What Does the Second Amendment Mean Today?, 76 Chi.-Kent L.Rev. 291, 317 (2000), or that the word "keep," as used in the Second Amendment, has no independent content because the Second Amendment does not protect a right to "own" or to "possess" arms, Silveira, 312 F.3d at 1072 ("We consider it highly significant ... that the second clause does not purport to protect the right to `possess' or `own' arms, but rather to `keep and bear' arms."). Collective rights supporters argue further that the term "bear arms" refers only to members of an organized militia during actual service. Id. ("Historical research shows that the use of the term `bear arms' generally referred to the carrying of arms in military service — not the private use of arms for personal purposes."). These interpretations of "keep and bear arms" are inconsistent with basic principles of constitutional interpretation, and conflict with the historical use and meaning of the words "keep" and "bear."
 
 
 20
 A respected canon of constitutional construction provides that we should give meaning and force to every individual word in the Constitution. "In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added.... No word in the instrument, therefore, can be rejected as superfluous or unmeaning ..." Holmes v. Jennison, 39 U.S. (14 Pet.) 540, 570-71, 10 L.Ed. 579 (1840); see also Wright v. United States, 302 U.S. 583, 588, 58 S.Ct. 395, 82 L.Ed. 439 (1938). To read "keep and bear" as a unitary phrase, the purported meaning of which turns solely on an interpretation of "bear," or to view "keep" as having no independent content, is wrong because it contravenes this long-accepted rule of construction. The phrase "keep and bear" is written in the conjunctive, and the most literal reading of this phrase is that it grants the people separate rights both to keep and to bear arms.
 
 
 21
 I also disagree with the conclusion of collective rights proponents that the term "bear arms" has only military connotations. In Emerson, the Fifth Circuit conducted an extensive analysis of the use of "bear arms" in early state constitutions and declarations of rights. 270 F.3d at 230 & n. 29. From this analysis, the Emerson court concluded that early nineteenth century constitutions and declarations of rights in at least ten different states gave "people" or "citizens" the right to "bear arms" in their own personal defense. Id. Such widespread use of the phrase "bear arms" in state grants of individual rights undercuts the argument that the drafters of the Second Amendment chose this phrase as a manner of indicating a collective right.
 
 
 22
 However, even if "bear" is presumed to have a military definition, the Second Amendment's further use of the word "keep" takes the scope of the Second Amendment beyond the right to bear arms in military defense. Had the drafters of the Second Amendment intended only to grant the people a right to carry arms while serving in the organized militia, the use of "bear" alone would have been sufficient.[7] The most common definition of "keep," both today as well as at the time the Second Amendment was drafted, is to have custody or possession of. See The American Heritage Dictionary 459 (3d ed.1994) (defining "keep" as "[t]o retain possession of"); Thomas Sheridan, A Complete Dictionary of the English Language (6th ed.1796) (defining "to keep" as "[t]o retain; to have in custody"); Samuel Johnson, A Dictionary of the English Language (7th ed.1785) (defining "to keep" as "to retain; not to lose" and also "[t]o have in custody"). Literally, a right to "keep" arms means a right to possess arms. And this right to possess arms goes beyond possession in military service. Colonial statutes often required those otherwise exempt from military service to "keep" arms, and also affirmatively prohibited blacks and Native Americans, persons then excluded from the militia, from "keeping" arms. See Silveira v. Lockyer, 328 F.3d 567, 574 (9th Cir.2003) (hereinafter Silveira II) (Kleinfeld, J., dissenting from denial of rehearing en banc).[8]
 
 B
 
 23
 The Second Amendment's prefatory clause states: "A well regulated Militia, being necessary to the security of a free State." As the Second Amendment's substantive guarantee confers an individual right to keep and bear arms, the question is whether the language of the Amendment's preamble modifies the right conferred by the substantive guarantee to limit it to a "collective" right. I am convinced that it does not.
 
 
 24
 Supporters of a collective rights interpretation read the term "militia" as used in the Second Amendment to mean "essentially a state military entity," and "not some amorphous body of the people as a whole." Silveira, 312 F.3d at 1070-72. However, the Second Amendment's language indicates that the "Militia" rests upon the shoulders of the people. And protecting the right of an individual to keep and bear arms certainly serves the Second Amendment's prefatory goal. Allowing citizens to keep arms furthers the effectiveness of a well-regulated militia, which is in turn necessary to the security of a free state. In the words of Professor Akhil Reed Amar, "the eighteenth-century `militia' referred to by the [Second Amendment] was not remotely like today's National Guard. It encompassed virtually all voters — like today's Swiss militia — rather than a small group of paid, semi-professional volunteers." Akhil Reed Amar, The Second Amendment: A Case Study in Constitutional Interpretation, 2001 Utah L.Rev. 889, 891 (2001). Stated another way, at the time that the Constitution was drafted, "the militia were the people and the people were the militia." Id. at 892.[9]
 
 
 25
 This interpretation is also consistent with the purposes and structure of the Second Amendment. The Second Amendment serves purposes: (1) to protect against external threats of invasion; and (2) to guard against internal threats to our republic. As I wrote previously in this case:
 
 
 26
 The practical concept of militia contemplates an armed citizenry capable of rising up, with what arms they hold or can find, to defeat, resist or at minimum delay an invader until more organized power can be marshalled. The likelihood of broad resistance from an armed citizenry is a deterrent to any would be invader. Equally important, the practical concept of militia, embracing an armed citizenry, stands to deter risk of government degradation to tyranny.
 
 
 27
 Nordyke, 319 F.3d at 1198 (Gould, J., specially concurring). The text of the Second Amendment makes clear the purpose to oppose foreign threats and preserve national security. The purpose of the militia to stand against the potential tyranny of the domestic government is implicit and is documented by contemporaneous parallel provisions of state constitutions and declarations of rights.[10]
 
 
 28
 Judge Kozinski has cautioned that we not "fall[] prey to the delusion ... that ordinary people are too careless and stupid to hold guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll.... [T]he simple truth — born of experience — is that tyranny thrives best where government need not fear the wrath of an armed people." Silveira II, 328 F.3d at 569 (Kozinski, J., dissenting from denial of rehearing en banc). Judge Kozinski documents his argument persuasively, noting the "sorry history" of our nation when disarmament was used in the South to subjugate slaves, and blacks who had been freed. Judge Kozinski also brought home the risks of tyranny by relating these risks to totalitarian regimes infamous in twentieth century history, explaining that:
 
 
 29
 All too many of the other great tragedies of history — Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few — were perpetrated by armed troops against unarmed populations. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece. ... If a few hundred Jewish fighters in the Warsaw Ghetto could hold off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.
 
 Id. at 569-70.[11]
 
 30
 And as I wrote in my separate concurrence in this case:
 
 
 31
 Those who debated and framed the Bill of Rights were educated in practical political concepts and doubtless recognized that an opening gambit for tyrants is to disarm the public. If the Second Amendment is held to protect only a state-regulated militia, then there would be no constitutional bar to a federal government outlawing possession of all arms by hunters and those with legitimate needs for protection. A general confiscation of guns could become the order of the day. I believe that result is foreclosed by the salient purpose of the Second Amendment to guard against tyranny, and that an individual right to keep and bear arms must be recognized.[12]
 
 
 32
 Nordyke, 319 F.3d at 1196-97 (Gould, J., specially concurring).
 
 
 33
 However, even if I were to assume that the prefatory clause did modify the Second Amendment's substantive guarantee, I would still reach the conclusion that the Second Amendment guarantees an individual right. The First Militia Act of 1792, 1 Stat. 271 (1792), passed only a few years after ratification of the Constitution, provides a contemporaneous window on the accepted meaning of the term "militia" at the time the Constitution was drafted. This point has been well explained by Judge Kleinfeld:
 
 
 34
 The Second Amendment was ratified in 1791. The next year, Congress enacted the Militia Act, implementing the Amendment and incorporating the general understanding of the time as to what the word meant, and establishing that the militia was indeed what [Silveira] says it was not — an "amorphous body of the people as a whole." The Militia Act of 1792 defined the "militia" as: "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years." Thus, contrary to the "collective rights" notion in [Silveira], the militia was precisely not "a state entity, a state fighting force," limited to those who are active members of such a collective organization. It was all the able-bodied white male citizens from 18 to 45, whether they were organized into a state fighting force or not."
 
 
 35
 Silveira II, 328 F.3d at 578 (Kleinfeld, J., dissenting from denial of rehearing en banc) (footnotes omitted).[13]
 
 
 36
 The definition of "militia" provided in the First Militia Act is also consistent with the present federal statutory definition of that term, 10 U.S.C. § 311:
 
 
 37
 Today the United States Code still defines the term "militia." The modern statute, instead of narrowing the militia to an organized body of regularly supervised and trained part time soldiers, broadens the term. The statute specifies that the "militia" consists not only of the "organized" militia, consisting of the National Guard and the Naval Militia, but also an "unorganized militia." The "unorganized militia" is precisely what [Silveira] says it is not, "an amorphous body of the people as a whole." Now, instead of being limited to white male citizens between 18 and 45, the militia has (of course) no racial restriction. Non-citizens are now included, provided they have declared an intention to become citizens. The sex restriction is gone and females are included if they are members of the National Guard. People become part of the militia now at age 17 instead of 18. The only narrowing of the statutory scope is that we are no longer required by law to own and furnish guns, ammunition, and bayonets. So now the militia consists not only of all white male citizens between 18 and 45, but also all able-bodied non-white males, whether citizens or non-citizens declared for citizenship, between 17 and 45, and all females in the National Guard. Those of us who are male and able-bodied have almost all been militiamen for most of our lives whether we know it or not, whether we are organized or not, whether our state governments supervised our possession and use of arms or not.
 
 
 38
 Silveira II, 328 F.3d at 581 (Kleinfeld, J., dissenting from denial of rehearing en banc) (footnote omitted).
 
 
 39
 Furthermore, the Supreme Court has also had opportunity to expound on the historical meaning of the word "militia." In United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the most recent Supreme Court precedent interpreting the Second Amendment, the Court devoted a substantial portion of its opinion to a discussion of the scope of the "militia." Id. at 178-82, 59 S.Ct. 816. Looking to "the debates in the [Constitutional] Convention, the history and legislation of the Colonies and States, and the writings of approved commentators," id. at 179, 59 S.Ct. 816, the Supreme Court concluded that the militia referred to by the Second Amendment was neither an organized fighting force nor a formal state military entity, id. at 178-79, 59 S.Ct. 816 ("The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia — civilians primarily, soldiers on occasion."). In the words of the Court: "the Militia comprised all males physically capable of acting in concert for the common defense. A body of citizens enrolled for military discipline."[14] Id. at 179, 59 S.Ct. 816; see also Silveira II, 328 F.3d at 577-78 (Kleinfeld, J., dissenting from denial of rehearing en banc).
 
 
 40
 I do not read the prefatory clause of the Second Amendment to limit the scope of the substantive guarantee of the right to keep and bear arms. Even if a limiting purpose is attributed to the prefatory clause's reference to "militia," the First Militia Act, the current federal statutory definition of "militia" and the Supreme Court's review of the historical meaning and purpose of the militia at the time of the framers are in accord that a "militia" is not restricted to the organized state military. Instead, these authorities support the conclusion that the militia consists of everyday civilians from a broad swath of the population. It is by granting these ordinary civilians the right to keep and bear arms that the Second Amendment aims to further the effectiveness of a "well-regulated militia," which in turn is "necessary to the security of a free State."
 
 II
 
 41
 Historical analysis also supports the conclusion that the framers of the Bill of Rights intended for the Second Amendment to create an individual right to keep and bear arms. The Fifth Circuit devoted a substantial portion of the Emerson opinion to a detailed review of the debate between the Federalists, those in favor of a strong federal government, and Anti-Federalists, those skeptical of a powerful government, over the strength of the federal government established by the Constitution. See 270 F.3d at 236-51. A summary of the history of the Bill of Rights shows that contemporaneous concern over the strength of the federal government led to the creation of an individual right to keep and bear arms in the Second Amendment.
 
 
 42
 Although the government contemplated by the Constitution was one of limited, enumerated powers, the Anti-Federalists feared that the federal government would use its power to infringe on the fundamental rights of the people. One concern was the federal government's broad military power under the Constitution, including the power to call forth and organize the militia, U.S. Const. art. I, § 8, cl. 15, 16, and the power to raise and support a standing army, U.S. Const. art. I., § 8, cl. 12. The Anti-Federalists worried that this power could be used to control or destroy the militia, and that a tyrannical federal government could further use this power to leave the states and their citizens defenseless against the federal government's transgressions.[15]
 
 
 43
 The concerns of the Anti-Federalists did not stop adoption of the Constitution, which was soon ratified by the required nine states. However, these concerns did persuade the first Congress to consider the need to amend the Constitution to include a Bill of Rights. During consideration of what eventually became the Second Amendment, the Senate rejected a proposed amendment that would have granted states the power to arm and train their own militias. See Emerson, 270 F.3d at 249. In other words, the Senate expressly rejected an amendment proposing language that would support a collective rights view of the Second Amendment. The rejection of this proposed collective rights amendment and the concerns of Anti-Federalists regarding the federal government's broad military power under the unamended Constitution show that the first Congress saw the Second Amendment as protecting an individual right to keep and bear arms.
 
 
 44
 Contemporaneous legal commentary further shows that persons living in the late eighteenth and nineteenth centuries viewed the Second Amendment as conferring an individual right. In Emerson, the Fifth Circuit reviewed late-eighteenth century discourse regarding the Second Amendment. 270 F.3d at 251-55. The statements referred to by the Emerson court reveal a strong belief that the Second Amendment aimed for the protection of individual rights. Id. Similarly, in his well-written dissent from denial of rehearing en banc in Silveira, Judge Kleinfeld quotes from the writings of early nineteenth century commentators William Rawle and Justice Joseph Story, both of whom understood the Second Amendment to protect individual rights position. See Silveira II, 328 F.3d at 584-85 (Kleinfeld, J., dissenting from denial of rehearing en banc).
 
 
 45
 In A View of the Constitution of the United States of America, Rawle wrote of the Second Amendment that "[t]he prohibition is general. No clause of the Constitution could by any rule of construction be conceived to give congress a power to disarm the people." William Rawle, A View of the Constitution of the United States of America, 125-26 (2d ed. 1829). Similarly, Justice Story emphasized that "[t]he right of the citizens to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist, and triumph over them." 3 Joseph Story, Commentaries on the Constitution § 1890 (1833).[16]
 
 III
 
 46
 The individual rights view of the Second Amendment has also "enjoyed recent widespread academic endorsement." Nordyke, 319 F.3d at 1191. Scholars with such wide-ranging views as Laurence Tribe, Akhil Reed Amar, William Van Alstyne, and Eugene Volokh have come to a consensus that the Second Amendment protects an individual right to keep and bear arms.
 
 
 47
 In the most recent edition of his leading treatise, Professor Tribe sets forth that the "central object" of the Second Amendment "is to arm `We the People' so that ordinary citizens can participate in the collective defense of their community and their state." 1 Laurence Tribe, American Constitutional Law 902, n. 221 (3d ed.2000). According to Professor Tribe, the Second Amendment achieves this purpose "by assuring that the federal government may not disarm individual citizens without some unusually strong justification consistent with the authority of the states to organize their own militias. That assurance in turn is provided through recognizing a right (admittedly of uncertain scope) on the part of individuals to possess and use firearms in the defense of themselves and their homes...." Id.
 
 
 48
 Other commentators are in accord with Professor Tribe's conclusion. Professor William Van Alstyne writes that the Second Amendment "looks to an ultimate reliance on the common citizen who has a right to keep and bear arms rather than only to some standing army, or only to some other politically separated, defined, and detached armed cadre, as an essential source of security of a free state. In relating these propositions within one amendment, moreover, it does not disparage, much less does it subordinate, `the right of the people to keep and bear arms.'" William Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L.J. 1236, 1243 (1994). Professor Amar adds that the Second Amendment recognizes the view of its framers that "[r]ather than placing full confidence in a standing army filled with aliens, convicts, vagrants, and mercenaries — who do not truly represent the electorate, and who may pursue their own agendas — a sound republic should rely on its own armed citizens — a `militia' of `the people'." Amar, supra, at 892.[17] The better view in the contemporary debate supports an individual right to keep and bear arms, subject as with all other core constitutional rights to reasonable restrictions that pass constitutional scrutiny.
 
 IV
 
 49
 The Second Amendment protects the right "of the people." It protects the people's right not only to "bear arms," which may be read as having a military connotation, but also to "keep arms," which can only be interpreted as having an individual one. By rejecting the individual right to keep arms, Hickman fails to do justice to the language of the Second Amendment. Hickman also disregards the important lesson of history that an armed citizenry can both repel external aggression and check the danger of an internal government degenerating to tyranny.
 
 
 50
 I do not think that individual rights under the Second Amendment are outmoded, for reasons expressed in my earlier concurrence in this case: "[The Second Amendment] was designed to provide national security not only when our country is strong but also if it were to become weakened or otherwise subject to attack. As the people bear the risk of loss of their freedom and the pain of any attack, our Constitution provides that the people have a right to participate in defense of the Nation. The Second Amendment protects that fundamental right." Nordyke, 319 F.3d at 1198 (Gould, J., specially concurring).
 
 
 
 Notes:
 
 
 [1]
 Similarly, for the reasons expressed herein, I am not persuaded by the elaboration of a collective rights view in our circuit's opinion inSilveira v. Lockyer, 312 F.3d 1052 (9th Cir.2002), cert. denied, 540 U.S. 1046, 124 S.Ct. 803, 157 L.Ed.2d 693 (2003). To the contrary I think Silveira continues mistakenly to endorse the ill-advised theory of Hickman.
 
 
 [2]
 This is the current view of the United States, as reflected in the United States' opposition to the petition for certiorari filed inEmerson. See Opposition to Petition for Certiorari in United States v. Emerson, No. 01-8780, at 19-20 n. 3, available at http://www. usdoj.gov/osg/briefs/2001/0responses/2001-8780.resp.pdf ("The current position of the United States ... is that the Second Amendment more broadly protects the rights of individuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions designed to prevent possession by unfit persons or to restrict the possession of types of firearms that are particularly suited to criminal misuse."); see also Memorandum from the Attorney General to All United States Attorneys, re: United States v. Emerson (Nov. 9, 2001), available at http://www. usdoj.gov/osg/briefs/2001/0responses/2001-8780.resp.pdf ("In my view, the Emerson opinion ... generally reflect[s] the correct understanding of the Second Amendment.").
 
 
 [3]
 If this issue, as presented inNordyke, arises in a similar case in some other circuit, it may also be necessary to consider whether the Second Amendment's protections are incorporated in the Due Process Clause of the Fourteenth Amendment. See Nordyke, 319 F.3d at 1193 n. 3 (Gould, J., specially concurring).
 
 
 [4]
 With respect to rights and powers of the people,see, e.g., U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.") (emphasis added); amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.") (emphasis added); amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.") (emphasis added); amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.") (emphasis added).
 
 
 [5]
 With respect to the power and authority of government,see, e.g., U.S. Const. art. I, § 1, cl. 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States.") (emphasis added); art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America.") (emphasis added); art. III, § 1, cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court.") (emphasis added); amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.") (emphasis added).
 
 
 [6]
 See U.S. Const. amend. I ("the right of the people peaceably to assemble"); amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."); amend. IX ("rights... retained by the people"); amend. X ("powers not delegated... are reserved to the States, respectively, or to the people").
 
 
 [7]
 In concluding that "keep" has no independent meaning, theSilveira court found it to be "highly significant" that the Second Amendment "does not purport to protect the right to `possess' or `own' arms, but rather to `keep and bear' arms." 312 F.3d at 1072. I also find the use of the word "keep" (which, as I note infra, is a synonym of "possess") to be "highly significant," albeit for different reasons. The use of "keep," as opposed to "own" shows that ownership is irrelevant for purposes of the Second Amendment. One's right to keep or possess arms is independent from ownership. The Second Amendment protects not only the rights of arms owners, but also the rights of persons who keep or act as the bailees of arms that belong to friends or relatives.
 
 
 [8]
 Further support for the position that "keep" connotes an individual, and not a collective, right to possess arms comes from the briefing inEmerson. As the opinion in that case notes, neither the government, which was then arguing for a collective rights interpretation of the Second Amendment, nor the amici in support of the government's position maintained that "keep" commanded a military meaning. Emerson, 270 F.3d at 232.
 
 
 [9]
 Professor Amar further explains that an earlier draft of the Second Amendment recited that the "militia" would be "composed of the body of the people."Id. (citing The Complete Bill of Rights 170-73) (Neil H. Cogan ed., 1997)."
 
 
 [10]
 Numerous early state constitutions expressly recognized the risk of tyranny by a domestic government and the need for an independent militia to stand ready to check this threatSee, e.g., Ind. Const. art. I, § 20 (1816) ("That the people have a right to bear arms for the defence of themselves and the State; and that the military shall be kept in strict subordination to the civil power."); N.C. Declaration of Rights § XVII (1776) ("[T]he people have a right to bear arms, for the defence of the State, and, as standing armies, in time of peace, are dangerous to liberty, they ought not be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power."); Ohio Const. art. VIII, § 20 (1802) ("That the people have a right to bear arms for the defense of themselves and the State; and as standing armies, in time of peace, are dangerous to liberty, they shall not be kept up, and that the military shall be kept under strict subordination to the civil power."); Penn. Const., Declaration of Rights, cl. XIII (1776) ("[T]he people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And... the military should be kept under strict subordination, to, and governed by, the civil power."); Vt. Const., ch. I, art. 16 (1777) ("[T]he people have a right to bear arms for the defence of themselves and the State — and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and ... the military should be kept under strict subordination to and governed by the civil power."); Va. Const., art. I, § 13 (1776) ("[A] well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state; ... standing armies, in time of peace, should be avoided as dangerous to liberty; and ... in all cases the military should be under strict subordination to, and governed by, the civil power."). That these early state constitutions recognized the risk of governmental tyranny reinforces the conclusion that the Second Amendment must be viewed with that risk in mind. See, e.g., Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 1314, 158 L.Ed.2d 1 (2004) ("That early state constitutions saw no problem in explicitly excluding only the ministry from receiving state dollars reinforces our conclusion that religious instruction is of a different ilk.").
 
 
 [11]
 Judge Kozinski elaborates further that:
 The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed — where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.
 Id. at 570.
 
 
 [12]
 See also Thomas Cooley, The General Principles of Constitutional Law 281-82 (2d ed. 1891):
 It may be supposed from the phraseology of [the Second Amendment] that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. The militia, as has been elsewhere explained, consists of those persons who, under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon. But the law may make provision for the enrollment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and if the right were limited to those enrolled, the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms, and they need no permission or regulation of law for the purpose.
 
 
 [13]
 The racially restrictive definition of "militia" used in the First Militia Act of course would now clearly violate the Fourteenth Amendment and potentially violate the Thirteenth Amendment, as well as offend our sensibilities
 
 
 [14]
 Despite this language, theSilveira opinion concludes that Miller "strongly impl[ies] that the Supreme Court rejects the traditional individual rights view." 312 F.3d at 1061. I believe this conclusion to be in error.
 In Emerson, the Fifth Circuit conducted an extensive analysis of the briefing before the Supreme Court in Miller. 270 F.3d at 221-27. This analysis of Emerson, is thoughtful and accurate. The Fifth Circuit found the government's briefing in Miller to present two arguments: first, a broad constitutional argument that the Second Amendment protects only a collective right to keep and bear arms; and second, a case-specific argument that the Second Amendment protects only arms with a military or defense purpose and not "those weapons which are commonly used by criminals." Id. at 222. Comparing the holding of Miller to these arguments, Emerson concludes that Miller was decided on the second of the government's arguments, and that Miller therefore does not implicitly endorse the collective rights view of the Second Amendment. Id. at 224; see Miller, 307 U.S. at 178, 59 S.Ct. 816 (concluding that "[i]n the absence on any evidence tending to show that possession or use of a[sawed-off shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument").
 
 
 [15]
 For a summary of concerns of leading anti-Federalists, including Patrick Henry and George Mason, seeEmerson, 270 F.3d at 237-39, nn. 39-45.
 
 
 [16]
 Judge Kleinfeld also aptly reviewed our Constitution's historical antecedents, including the English Declaration of Rights and William Blackstone'sCommentaries on the Laws of England. Silveira II, 328 F.3d at 582-84. These predecessor texts recognized a private individual right to bear arms, and support that the framers of the Bill of Rights crafted the Second Amendment to protect individual, and not merely collective, rights.
 
 
 [17]
 For further commentary, see Don B. Kates, Jr.,Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L.Rev. 204, 211-43 (1983); Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 642 (1989); Robert E. Shalhope, The Ideological Origins of the Second Amendment, 69 J. Am. Hist. 599 (1982); Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L.Rev. 793 (1998).